1

2

3

4

5

6

7

8                        **UNITED STATES DISTRICT COURT**

9                        **CENTRAL DISTRICT OF CALIFORNIA**

10

11  JULIET M. EDWARDS,              )   NO. CV 12-05875 SS
                                    )
12                  Plaintiff,      )
                                    )
13            v.                    )
                                    )   **MEMORANDUM DECISION AND ORDER**
14  CAROYLN W. COLVIN,              )
    Acting Commissioner of the      )
15  Social Security Administration, )
                                    )
16                  Defendant.      )
    _____)

17

18                              **I.**

19                          **INTRODUCTION**

20

21      Juliet M. Edwards ("Plaintiff") brings this action seeking to

22  overturn the decision of the Commissioner of the Social Security

23  Administration (the "Commissioner" or the "Agency") denying her

24  application for Disability Insurance Benefits ("DIB") and Supplemental

25  Security Income benefits ("SSI").[1]  The parties consented, pursuant to

26  _____

27      [1]  The Court notes that Carolyn W. Colvin became the Acting
    Commissioner of the Social Security Administration on February 14, 2013.
28  Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil
    Procedure, the Court orders the that the caption be amended to

28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge.  For the reasons stated below, the decision of the Agency is AFFIRMED.

## II.

### PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on November 13, 2009. (Administrative Record ("AR") 97, 104).  She alleged a disability onset date of February 18, 2002.  (Id.).  Plantiff's last-insured date was September 30, 2007.  The Agency denied her claims on January 21, 2010. (AR 56).  On March 2, 2010, Plaintiff filed a written request for a hearing.  (AR 64).  On February 14, 2011, a hearing was held before Administrative Law Judge ("ALJ") David G. Marcus.  (AR 23-44). Plaintiff was represented by counsel and testified at the hearing.  (AR 25-39).  A vocational expert ("VE") also testified.  (AR 39-43).

On April 21, 2011, the ALJ issued a decision denying benefits.  (AR 18).  On May 9, 2011, Plaintiff requested that the Appeals Council review the ALJ's decision.  (AR 9).  The Appeals Council denied Plaintiff's request on June 5, 2012.  (Id.).  Plaintiff then requested judicial review by filing the instant action on July 13, 2012.

\\

\\

\\

_____

substitute Carolyn W. Colvin for Michael J. Astrue as the defendant in this action.

2

**III.**

**FACTUAL BACKGROUND**

Plaintiff, who was born in 1960, has a high school education. (AR 128). Plaintiff worked as an office assistant, "clerk/typist," and secretary from 1987 until February 16, 2001. (AR 29, 124, 131-35). At the ALJ hearing, Plaintiff testified that she fell off of a chair at work and injured her tailbone "around August the 20th of 2000" but resumed her normal work duties after her treating physician cleared her to return to work. (AR 29-30).

Despite Plaintiff's contention that she was injured in August of 2000, Plaintiff alleged a disability onset date of February 18, 2002 and testified that she had not worked since February 16, 2001. (See AR 30). Specifically, Plaintiff testified that she stopped working when she was laid off for being "in trouble with the law." (Id.). Plaintiff stated that she "ha[d] a [drug possession] felony" that she "had to clear up." (Id.). When asked if she looked for other work, Plaintiff testified that she was incarcerated for a period of time: "I was incarcerated back in 2001. That's the reason I lost my job." (AR 31). Plaintiff also testified that she had a "felony warrant" for about eight years: "I had a felony warrant for about eight years. And they finally caught up with me . . . . And they put me in a drug program which I didn't complete." (AR 31). Plaintiff stated that she did not attempt to get her job back upon being released because the conviction disqualified her from employment with the school district. (AR 30-31). However, Plaintiff also stated that she cannot work due to back pain caused by the 2000 incident. (AR 32).

**A.   Plaintiff's Medical History**

Although Plaintiff asserts that she was injured when she fell off a chair in 2000, her first treatment records are from 2001. On February 1, 2001, Plaintiff sought treatment for abdominal pain. (AR 185). According to hospital records, Plaintiff complained of "eating too much cheesecake." (Id.). At that time, Plaintiff was not taking any medication. (Id.). Plaintiff also did not complain of back pain. (See id.) On April 23, 2001, Plaintiff saw internal medicine physician Dr. Ackerman for a sore throat. (AR 187). Plaintiff did not complain of back pain at that time. (See id.). However, on August 28, 2001, Plaintiff saw Dr. Asimont for lower back pain. (AR 188). According to Dr. Asimont's notes, Plaintiff complained that she "need[ed] a [doctor's] excuse [not] to go to work." (Id.). Plaintiff also reported that she was not taking any medication. (Id.).

On September 9, 2001, Plaintiff saw her primary treating physician, Dr. Chi Kit Cheung, for lower back pain. (AR 190-91). According to Dr. Cheung's notes, Plaintiff complained of experiencing lower back pain after she "was sitting at a desk and her chair gave out under her and she fell and landed on her buttock" while working as a secretary for the Los Angeles Unified School District. (AR 190). Dr. Cheung reported that Plaintiff was prescribed Naprosyn 500 mg as needed for pain. (Id.). Additionally, according to Dr. Cheung's notes, "[e]xam revealed a well-developed female in no acute distress." (Id.). "Examination of her back showed 1+ tenderness in the midlumbar spine with no spasm or ecchymosis." (Id.). Additionally, Dr. Cheung reported that Plaintiff's "gait is normal and motor and sensory functions are within normal limits

4

1  in the lower extremities." (Id.). Dr. Cheung diagnosed Plaintiff with
2  "[c]hronic low back pain exacerbated by 4 at work." (AR 191).
3  Additionally, Dr. Cheung referred Plaintiff to physical therapy twice
4  a week for the next four weeks and gave Plaintiff "30 days of work
5  restrictions from 9/21/01 which includes no lifting over 30 pounds, no
6  repetitive bending, and squatting." (Id.). However, Dr. Cheung
7  concluded that Plaintiff "can work up for [sic] four hours a day."
8  (Id.).
9
10     On January 8, 2002, Plaintiff again saw Dr. Cheung for lower back
11  pain. (AR 196). According to Dr. Cheung, despite Plaintiff's testimony
12  that she was injured in August of 2000, Plaintiff claimed that the
13  incident occurred on August 17, 2001. (Id.). Dr. Cheung reported that,
14  upon examination, Plaintiff presented as "a well-developed female in no
15  acute distress." (Id.). "Examination of her back showed 1+ tenderness
16  in the midlumbar spine with no spasm or scchymosis." (Id.). According
17  to Dr. Cheung, Plaintiff reported that her back pain had "completely
18  resolved" with therapy. (AR 196). Physical therapy records from Kaiser
19  Permanente state that Plaintiff failed to keep a physical therapy
20  appointment on September 27, 2001. (AR 199). Plaintiff also failed to
21  reschedule that appointment. (Id.). On January 8, 2002, Dr. Cheung
22  concluded that Plaintiff "has no permanent disability" and "can return
23  to work with no restrictions today." (AR 197).
24
25     On January 17, 2002, Plaintiff saw Dr. Peter Yeung for back pain.
26  (AR 201). According to Dr. Yeung's notes, an examination of Plaintiff
27  "reveal[ed] minimal tenderness along the bilateral lumbar paraspinal
28  areas" and "no evidence of any tenderness, spasms or trigger points."

1  (<u>Id.</u>).  Additionally, "[p]alpation of the coccygeal area reveal[ed] no

2  significant tenderness."  (<u>Id.</u>).  Dr. Yeung diagnosed Plaintiff with

3  "[l]ow back pain, exacerbation."  (<u>Id.</u>)  Nevertheless, Dr. Yeung

4  "cleared [Plaintiff] to return to work without restrictions" after

5  January 18, 2002.  (<u>Id.</u>).

6

7      Plaintiff began seeing her current treating source, the Central

8  Neighborhood Health Foundation, on April 24, 2009.  (AR 238).  At that

9  time, Plaintiff sought treatment for lower back pain from Dr. Vital

10  Hinojosa.  (<u>Id.</u>).  Dr. Hinojosa reported that Plaintiff had low back

11  pain, sciatcia, and neck pain from a 2002 injury.  (<u>Id.</u>)  Dr. Hinojosa

12  also reported that Plaintiff otherwise had no abnormalities and had "no

13  rash, itching, dryness or lesions."  (<u>Id.</u>).  On July 7, 2009, Plaintiff

14  sought treatment for a fever from Dr. Hinojosa.  (AR 239).   According

15  to Dr. Hinojosa's notes, Plaintiff reported that her back pain was

16  improved.  (AR 239).  On July 15, 2010, Plaintiff sought treatment at

17  the Central Neighborhood Health Foundation after having "a seizure for

18  about one minute."  (AR 240-41).  Based on an examination conducted that

19  same day, Plaintiff "appear[ed] in no apparent distress, . . . look[ed]

20  her given age, well-developed and nourished with good attention to

21  hygiene and body habits."  (AR 240).  Plaintiff did not complain of back

22  pain at that time.  However, Plaintiff sought treatment at the Central

23  Neighborhood Health Foundation on January 25, 2011 for lower back pain.

24  (AR 236).  At that time, Plaintiff reported that the back pain resulted

25  from an injury sustained in 2001.  (<u>Id.</u>).  According to the medical

26  report, Plaintiff was "tender in the lumbrosacral area" and had a rash.

27

28

1 (Id.) (noting that Plaintiff had a "white spot" but not specifying its
2 location). Plaintiff was prescribed a three week trial of Ultram 50 mg.
3 (AR 237).

4

5 **B. <u>Consultative Examination</u>**

6

7     On January 14, 2010, Plaintiff saw Dr. Harlan Bleecker for a
8 complete orthopedic evaluation at the request of the Department of
9 Social Services. (AR 207). At that time, Plaintiff was not taking any
10 medication. (Id.). Based on observation and physical examination, Dr.
11 Bleecker reported that "[Plaintiff] is well-developed, well-nourished
12 and in no acute distress." (AR 208). Dr. Bleecker also reported that
13 "[Plaintiff] sits and stands with normal posture. There is no evidence
14 of any tilt or list, and [Plaintiff] sits comfortably during the
15 examination. In obtaining the upright position, [Plaintiff] rises from
16 a chair without difficulty. The gait is normal. [Plaintiff] walks on
17 tiptoes and heels without difficulty with no evidence of weakness in the
18 ankle flexors or extensors." (Id.). Dr. Bleecker further noted that
19 "[Plaintiff] is able to get on and off the examining table without
20 difficulty." (Id.). According to Dr. Bleecker, x-rays indicated "loss
21 of the intervertebral disk spaces T12-L1, L1-L2, L2-L3, L3-4 and some
22 at the L4-5 with anterior spurring from T12 on down." (AR 209-10). Dr.
23 Bleecker diagnosed Plaintiff with "[d]egenerative disk disease,
24 degenerative arthritis lumbar spine." (AR 210). Dr. Bleecker also
25 reported that "[Plaintiff] can sit 6 out of 8 hours, stand and walk 6
26 out of 8 hours, lift 20 pounds occasionally, 10 pounds frequently with
27 no restrictions to her upper or lower extremities." (Id.).

28

**C.    Vocational Expert's Testimony**

A vocational expert testified at Plaintiff's hearing. (AR 39-44). The expert testified that Plaintiff's past work was as an administrative clerk, which is considered light or sedentary work. (AR 40). The expert also testified that a hypothetical individual of Plaintiff's vocational profile and RFC would be able to perform Plaintiff's past relevant work. (AR 41).

**D.    Plaintiff's Testimony**

At the hearing, Plaintiff testified that she stopped working on February 16, 2001. (AR 29). However, according to Plaintiff, she is unable to work after an accident that occurred in August of 2000 caused her to have lower back pain. (Id.). Plaintiff also stated that she returned to work as a school district administrative clerk after the August 2000 accident, did not assume modified duties, and engaged in activities including working on the computer for eight hours a day. (AR 29-30). Plaintiff stated that at that time, she would "get up and walk around" because "if [she would] sit down for too long, . . . [her] back would pain [sic]." (AR 30).

However, Plaintiff also testified that she stopped working on February 16, 2001 because she "got laid off" after getting "in trouble with the law." (Id.). Plaintiff stated that she was then incarcerated "for a drug possession" and was later "put . . . on felony probation." (Id.). Plaintiff further testified that although she "cleared it up,"

1   she did not attempt to regain employment at the school district because
2   the felony disqualified her from working with children.  (Id.).

3

4       Plaintiff nevertheless testified that she is unable to return to
5   work due to pain that "goes from [her] back to [her] legs." (AR 32).
6   Plaintiff stated, "I can't sit down for too long.  Because I have a pain
7   if I'm walking for a long period of time.  I have to sit down.  Or if
8   I'm walking I'll have a sharp pain in my back which prevents me from
9   continuing." (Id.).  Plaintiff also stated that she is unable to sit
10  for more than fifteen or twenty minutes at a time, cannot stand for more
11  than twenty-five or thirty minutes at a time, and "[does not] get much
12  sleep because [she] is in pain at night." (AR 32, 34).  Plaintiff
13  stated that she cannot sleep for more than two hours without being woken
14  by pain.  (AR 34).  Further, Plaintiff testified that she "wear[s] a
15  back brace to kind of help with the pain" and uses a cane "practically
16  every day." (AR 33).  Plantiff acknowledged that neither the back brace
17  nor the cane were prescribed by doctors.  (AR 33, 37).  Instead,
18  according to Plaintiff, the "doctor told [her] that she could get [the
19  cane] on [her] own" and "that [she] could get the back brace or the
20  cane." (AR 37).  Plaintiff testified that she began using a cane nine
21  or ten months prior to the hearing.  (Id.).  Plaintiff also testified
22  that she is able to lift a gallon of milk and do household chores.  (AR
23  36).

24

25  \\

26  \\

27  \\

28  \\

# IV.

## THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[2] and that is expected to result in death or to last for a continuous period of at least twelve months.  <u>Reddick v. Chater</u>, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. § 416.920.  The steps are:

(1)  Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled. If not, proceed to step two.

(2)  Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)  Does the claimant's impairment meet or equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is

---

[2]  Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. § 416.910.

found disabled.  If not, proceed to step four.

(4)   Is the claimant capable of performing her past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)   Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001); 20 C.F.R. § 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.  Bustamante, 262 F.3d at 953-54.  If, at step four, the claimant meets her burden of establishing an inability to perform the past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's RFC, age, education and work experience.  Tackett, 180 F.3d at 1100; 20 C.F.R. § 416.920(g)(1).  The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids").  Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).  When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000).

\\

**V.**

**THE ALJ'S DECISION**

Plaintiff appeared and testified at a hearing held before ALJ David G. Marcus on February 14, 2011. (AR 23-44). Plaintiff was represented by counsel and testified at the hearing. (AR 25-39). An impartial vocational expert ("VE") also testified at the hearing. (AR 39-43).

ALJ Marcus then employed the five-step sequential evaluation process and concluded that Plaintiff was not disabled under the Social Security Act. (AR 13-18). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 18, 2002. (AR 15). At step two, the ALJ found that Plaintiff had the severe impairment of "degenerative disc disease and degenerative arthritis of the lumbar spine." (Id.). At step three, the ALJ throughly considered the impairments listed in step two and found that, through the last-insured date, none of them met or medically equaled a listed impairment. (Id.). The ALJ then found that Plaintiff had the RFC "to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b)." (AR 16). Next, at step four, the ALJ found that Plaintiff could return to her past work. (Id.). The ALJ relied on the testimony of a vocational expert in coming to this conclusion. (Id.). Accordingly, the ALJ concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, from February 18, 2002, through the date of this decision." (AR 18).

\\

\\

12

**VI.**

**STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996). "Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720. It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21.

**VII.**

**DISCUSSION**

Plaintiff contends that the ALJ erred for four reasons. First, Plaintiff alleges that, when the ALJ determined Plaintiff's RFC, he failed to account for "an additional seizure impairment" that Plaintiff "may have had." (Compl. Mem. at 2). Plaintiff also contends that there were "indications in the record that plaintiff [sic] had abdominal pain

and a skin rash." (Id.).  Second, Plaintiff alleges that the ALJ failed to properly assess her credibility.  (Id. at 4).  Specifically, Plaintiff contends that the ALJ improperly concluded that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment." (Id.) (citing AR 16).  Third, Plaintiff alleges that the RFC assessment is deficient because the ALJ failed to enter specific findings regarding Plaintiff's strengths, including her ability to sit and stand.  (Id. at 6).  Fourth, Plaintiff contends that the ALJ should have called a medical expert to testify because her disability onset date may be unclear.  (Id. at 7).  Plaintiff's claims lack merit.  For the reasons discussed below, the Court finds that the ALJ's decision must be AFFIRMED.

**A.   The ALJ Properly Considered Plaintiff's Impairments When Assessing Plaintiff's RFC**

Plaintiff contends that the ALJ failed to take into account all of Plaintiff's impairments when assessing her RFC.  (Id. at 3).  Specifically, Plaintiff identifies two impairments that the ALJ allegedly failed to consider.  First, Plaintiff asserts that "she may have had an additional seizure impairment that was not taken into account." (Id. at 2).  Second, Plaintiff alleges that "[t]here were . . . indications in the record that [she] had abdominal pain and a skin rash." (Id.).  Plaintiff argues that "[w]hen determining a plaintiff's residual functional capacity, an ALJ must take into account all of an applicant's impairments, both severe and nonsevere and the resulting limitations imposed." (Id. at 3).  However, because the court finds

14

that the RFC reflected all of Plaintiff's impairments that were supported by the medical evidence, Plaintiff's claims fail.

Residual functional capacity is what a claimant can still do despite existing exertional and nonexertional limitations. See 20 C.F.R. § 404.1545(a)(1); Valentine v. Comm'r, Soc. Sec. Admin., 574 F.3d 685, 689 (9th Cir. 2009); Frost v. Barnhart, 314 F.3d 359, 366 (9th Cir. 2002). In determining a claimant's RFC, an ALJ "must consider all relevant evidence in the record, including . . . medical records, lay evidence, and the effects of symptoms . . . that are reasonably attributed to a medically determinable impairment." See Robbins v. Social Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006); see also SSR 96-8p; 20 C.F.R. § 404.1545. However, "[p]reparing a function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary." Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005).

Here, the record refutes Plaintiff's claim that the ALJ failed to properly consider her alleged seizure disorder and rash. In determining Plaintiff's RFC, the ALJ accurately observed that "[a] July 2010 [medical] note indicated that [Plaintiff] had suffered a seizure, but there is no follow-up other than a referral to Harbor-UCLA Medical Center." (AR 17, AR 240-41). As the ALJ also observed, "[Plaintiff] did not mention any history of seizure disorder in her testimony." (Id.). In sum, the ALJ explained that the seizure disorder was not adequately supported by the record. The ALJ was therefore not required to further consider Plaintiff's potential seizure disorder. Bayliss, 427 F.3d at 1217.

The record also refutes Plaintiff's claim that the ALJ failed to consider a January 25, 2011 examination report that Plaintiff sought treatment for a rash on her left arm and stomach.  (See AR 236). Indeed, the ALJ noted that specific medical records, including the report that Plaintiff had a rash in 2011, "are unremarkable in nature." (AR 17, 236).  Additionally, the ALJ expressly considered the January 2011 report but did not comment on the notation that Plaintiff had a "white spot" at the time of the examination.  (See id.).  The ALJ instead considered the relevant evidence from the report, noting that "[t]he clinical summary of January 2011 states that [Plaintiff] was in no apparent distress and was prescribed only a three-week trial of Ultram for her subjective complaint of lower back pain."  (See AR 17, 236-37).

Further, the ALJ thoroughly reviewed the record and cited numerous reports supporting the determination that Plaintiff "has the residual functional capacity to perform the full range of light work."  (AR 16). For example, the ALJ accurately noted that, in January of 2002, Plaintiff told her treating physician that "the low back pain has completely resolved since the therapy," and that Plaintiff's physician then cleared her to "return[] to work with no restrictions and without difficulty over the past 6 weeks."  (AR 16, 196).  The ALJ also accurately noted that Plaintiff had no neurological deficit and was not taking pain medication at that time.  (AR 16, 196-97).  Additionally, as the ALJ observed, Plaintiff's primary treating physician released her back to work with no restrictions and reported that her back pain had "resolved."  (AR 16, 197).

1    The ALJ also accurately noted that, according to Dr. Bleecker's
2  January 2010 consultative orthopedic evaluation, Plaintiff was taking
3  no medication and presented as "well-developed, well-nourished and in
4  no acute distress." (AR 208). Dr. Bleecker reported that "[Plaintiff]
5  sits and stands with normal posture. There is no evidence of any tilt
6  or list, and [Plaintiff] sits comfortably during the examination. In
7  obtaining the upright position, [Plaintiff] rises from a chair without
8  difficulty. The gait is normal. [Plaintiff] walks on tiptoes and heels
9  without difficulty [and] with no evidence of weakness in the ankle
10 flexors or extensors. [Plaintiff] is able to get on and off the
11 examining table without difficulty." (Id.). In addition, as the ALJ
12 noted, Dr. Bleecker diagnosed Plaintiff with "[d]egenerative disk
13 disease, degenerative arthritis lumbar spine" but reported that
14 "[Plaintiff] can sit 6 out of 8 hours, stand and walk 6 out of 8 hours,
15 lift 20 pounds occasionally, 10 pounds frequently with no restrictions
16 to her upper or lower extremities." (AR 210).

17

18   In sum, the ALJ properly considered the record, including the
19 January 2011 report and evidence of a potential seizure disorder when
20 assessing Plaintiff's RFC. Robbins, 466 F.3d at 883. As discussed
21 above, the ALJ expressly considered Plaintiff's alleged seizure
22 disorder, for which there was little supporting medical evidence.
23 Further, only a single medical report notes that Plaintiff ever had a
24 rash, and the ALJ expressly considered that medical report. (AR 236).
25 Additionally, there is no evidence that the rash limited Plantiff's
26 ability to work. Nor did Plaintiff complain of a rash when she applied
27 for benefits or during the ALJ hearing. Instead, each limitation
28 diagnosed by a physician or described by Plaintiff was included in the

17

1    ALJ's hypothetical question to the vocational expert. (See AR 40-43).
2    As the ALJ observed, the record as a whole overwhelmingly supports the
3    determination that Plaintiff is able to perform light work.
4    Accordingly, Plaintiff's claim that the ALJ failed to properly consider
5    all of Plaintiff's impairments in the ultimate RFC is meritless.

6

7    **B.    <u>The ALJ Provided Clear And Convincing Reasons For Rejecting</u>
8           <u>Plaintiff's Credibility</u>**

9

10       Plaintiff contends that the ALJ "failed to properly assess [her]
11   credibility." (Compl. Mem. at 4). Specifically, Plaintiff alleges that
12   the ALJ ignored Plaintiff's testimony that she took pain medication that
13   made her drowsy, has trouble sleeping, uses a cane, cannot sit for more
14   than fifteen or twenty minutes at a time, cannot stand for more than
15   twenty to twenty-five minutes at a time, and has difficulty
16   concentrating. (<u>Id.</u> at 5). In sum, Plaintiff claims that the ALJ
17   failed to provide clear and convincing reasons to reject Plaintiff's
18   testimony regarding the severity of her symptoms. (<u>Id.</u>). The Court
19   disagrees.

20

21       In assessing the credibility of a claimant's testimony regarding
22   subjective pain or the intensity of symptoms, the ALJ engages in a
23   two-step analysis. <u>Vasquez v. Astrue</u>, 572 F.3d 586, 591 (9th Cir.
24   2009). First, the ALJ must determine whether there is "'objective
25   medical evidence of an underlying impairment which could reasonably be
26   expected to produce the pain or other symptoms alleged.'" <u>Id.</u> (quoting
27   <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1036 (9th Cir. 2007)). If the
28   claimant has presented such evidence, and there is no evidence of

                                      18

malingering, then the ALJ must provide "'specific, clear and convincing reasons'" for rejecting the claimant's testimony about the severity of the symptoms. Id. (quoting Lingenfelter, 504 F.3d at 1036). At the same time, the ALJ is not "required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).

In evaluating the claimant's testimony, the ALJ may use "'ordinary techniques of credibility evaluation.'" Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1224 n.3 (9th Cir. 2010) (quoting Smolen, 80 F.3d at 1284). For example, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment," and "whether the claimant engages in daily activities inconsistent with the alleged symptoms." See Turner, 613 F.3d at 1224 n.3 (internal quotation marks omitted); Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (internal quotation marks omitted); Lingenfelter, 504 F.3d at 1040. An ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting. See Morgan v. Comm'r of Soc. Sec., 169 F.3d 595, 600 (1999). Further, even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment. See Turner, 613 F.3d at 1225. Likelihood of exaggeration is also a clear and specific reason for discounting a plaintiff's testimony. See Tonapetyan v. Halter, 242 F.3d

1144, 1148 (9th Cir. 2001).  A plaintiff's conflicting testimony may
also serve as clear and convincing grounds to reject such testimony.
Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002).

    Here, the ALJ gave specific, clear and convincing reasons to reject
Plaintiff's testimony about the severity of her symptoms.  The ALJ
thoroughly reviewed Plaintiff's medical record before explaining that
the objective medical evidence does not support her testimony.  (AR 16-
17).  As a basis for discounting Plaintiff's subjective testimony about
the severity of her symptoms and her alleged inability to work due to
a workplace injury, the ALJ noted that Plaintiff returned to work after
the injury and testified that she only stopped working when she lost her
job due to a felony drug offense.  (Id.).  Specifically, Plaintiff
testified that she stopped working when she lost her job because she was
"in trouble with the law" and had "a [drug possession] felony" that she
"had to clear up."  (AR 30).  Plaintiff stated that she had a felony
drug possession warrant that had been outstanding for eight years that
"finally caught up with [her]" and that she was "put . . . in[to] a drug
program which [she] didn't complete."  (Id.).  Plaintiff further stated
that she was incarcerated due to the felony and did not attempt to get
her job back upon being released because the conviction disqualified her
from her prior employment.  (AR 30-31).

    The ALJ also observed that contrary to Plaintiff's claims that back
pain prevents her from working and limits her to sitting for no more
than twenty minutes at a time and standing for no more than twenty-four
to thirty minutes at a time, Plaintiff's treating physician, Dr. Cheung,
cleared her to work.  (AR 16).  On January 8, 2002, Plaintiff saw her

treating physician for lower back pain. (AR 196). According to Dr. Cheung's notes, Plaintiff claimed that "[o]n the date of her injury she was sitting at a desk and her chair gave out under her and she fell and landed on her buttock." (Id.). However, Dr. Cheung reported that Plaintiff was "in no acute distress," "has no permanent disability," and "can return to work with no restrictions." (AR 196-97).

As discussed above, failure to seek or follow treatment is an additional basis for discrediting a claimant's subjective testimony regarding the severity of her symptoms. Tommasetti, 533 F.3d at 1039 (internal quotation marks omitted); Lingenfelter, 504 F.3d at 1040. Here, the ALJ observed that Plaintiff sought no significant medical treatment following her alleged disability onset date and failed to follow the prescribed course of treatment. (AR 16-17). Indeed, despite her claims of disability, the record contains no evidence that Plaintiff sought significant treatment for lower back pain after her disability onset date. Additionally, although Plaintiff's treating physician referred her to physical therapy on September 21, 2001, it is unclear whether Plaintiff ever attended physical therapy. (AR 191). Instead, physical therapy records from Kaiser Permanente indicate that on September 27, 2001, Plaintiff failed to keep a physical therapy appointment. (AR 199). Plaintiff also failed to reschedule that appointment. (Id.).

Further, the ALJ noted additional inconsistencies between Plaintiff's testimony and the record. (AR 16-17). As the ALJ observed, the consultative doctor's opinion is a clear and convincing reason to reject Plaintiff's testimony. (Id.). Plaintiff saw Dr. Bleecker for

21

a complete orthopedic evaluation at the request of the Department of Social Services on January 14, 2010. (AR 207). Despite Plaintiff's claims of debilitating impairment, Dr. Bleecker reported that "[Plaintiff] sits and stands with normal posture. There is no evidence of any tilt or list, and [Plaintiff] sits comfortably during the examination. In obtaining the upright position, [Plaintiff] rises from a chair without difficulty. The gait is normal. [Plaintiff] walks on tiptoes and heels without difficulty with no evidence of weakness in the ankle flexors or extensors. [Plaintiff] is able to get on and off the examining table without difficulty." (Id.). In conflict with Plaintiff's testimony regarding her inability to sit or stand for extended periods of time, Dr. Bleecker reported that "[Plaintiff] can sit 6 out of 8 hours, stand and walk 6 out of 8 hours, lift 20 pounds occasionally, 10 pounds frequently with no restrictions to her upper or lower extremities." (AR 210).

In sum, the ALJ employed precisely the sort of "ordinary techniques of credibility evaluation" that an ALJ may reply upon in assessing credibility. Turner, 613 F.3d at 1224 n.3 (internal quotation marks removed). As discussed above, the ALJ provided clear and convincing reasons to reject Plaintiff's credibility. Accordingly, Plaintiff's claim fails.

**C.   The ALJ Made Specific Findings When Assessing Plaintiff's RFC**

Plaintiff alleges that the ALJ improperly assessed her RFC by failing to enter specific findings regarding Plaintiff's strengths, including her ability to sit and stand. (Compl. Mem. at 6).

Specifically, Plaintiff states that, pursuant to SSR 96-8p, the ALJ was required to set forth her RFC in a narrative discussion, "describing how the evidence supports each conclusion," "citing specific medical facts . . . and nonmedical evidence," and evaluating Plaintiff's "ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis." (Id.) (internal quotation marks omitted). In sum, Plaintiff contends that the ALJ failed to follow SSR 96-8p. (Id.). Plaintiff's claim fails.

As an initial matter, the record refutes Plaintiff's claim that the ALJ failed to follow SSR 96-8p. Pursuant to SSR 96-8p, an ALJ's RFC assessment must be based on all of the relevant evidence in the record, including symptoms that may be reasonably attributed to a medically determinable impairment. See Robbins, 466 F.3d at 883; see also SSR 96-8p. Further, an ALJ must give "careful consideration" to evidence regarding the effects of such symptoms "because subjective descriptions may indicate more severe limitations or restrictions than can be shown by medical evidence alone." See SSR 96-8p. Where there is evidence of a medically determinable impairment that could reasonably give rise to the reported symptoms, "careful consideration" requires an ALJ to make specific findings as to the credibility of the claimant's statements about those symptoms. Smolen, 80 F.3d at 1281.

Here, the ALJ made specific findings as required by SSR 96-8p. First, the ALJ made findings regarding the credibility of Plaintiff's statements. As discussed above, the ALJ comprehensively detailed contradictions between Plaintiff's subjective claims and the record. The ALJ also gave careful consideration to all of the relevant evidence

23

in the record and "provide[d] a narrative discussion describing how the evidence supports each conclusion . . . ." SSR 96-8p. For example, the ALJ explained that "the overall record is quite scant" but noted that while Plaintiff alleged an inability to sit for more than twenty minutes at a time and stand for more than twenty-four to thirty minutes at a time, Plaintiff's treating physician saw Plaintiff in January of 2002 and reported that Plaintiff was "in no acute distress" and "has no permanent disability." (AR 16, 196-97). As the ALJ observed, Plaintiff's treating physician cleared her to work "with no restrictions." (AR 197).

Additionally, after noting the thin record, the ALJ placed great emphasis on Dr. Bleecker's consultative physician's report. (AR 16-17). As discussed above, Dr. Bleecker concluded that Plaintiff "can sit 6 out of 8 hours, stand and walk 6 out of 8 hours, lift 20 pounds occasionally, 10 pounds frequently with no restrictions to her upper or lower extremities." (AR 210). That diagnosis is consistent with the ALJ's RFC assessment: "[Plaintiff] has the residual functional capacity to perform the full range of light work . . . ." (AR 16). Indeed, light work is defined as work involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and requiring "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b) and 416.967(b). Accordingly, contrary to Plaintiff's contentions, not only did the ALJ make specific findings regarding Plaintiff's strengths, including her ability to sit and stand, but the ALJ also provided a narrative discussion "describing

24

1  how the evidence supports each conclusion." SSR 96-8p. Plaintiff's
2  claim therefore fails.

3

4  **D.   The ALJ Was Not Required To Call A Medical Expert To Testify**

5

6      Lastly, Plaintiff briefly contends that the ALJ was required to
7  call a medical expert to testify because her disability onset date was
8  unclear. (Compl. Mem. at 7). However, Plaintiff's claim fails.

9

10      Pursuant to SSR 83-20, an ALJ must call a medical expert where a
11  plaintiff's disability onset date is unclear. See Sam v. Astrue, 550
12  F.3d 808, 811 (9th Cir. 2008). However, that requirement is only
13  triggered once a claimant has been found disabled. Id. at 809. Here,
14  Plaintiff relies upon Armstrong v. Comm'r, 160 F.3d 587, 590 (9th Cir.
15  1998), to support the proposition that a medical expert should have been
16  called to testify. In Armstrong, the Ninth Circuit explained that an
17  ALJ must call a medical expert where impairments combine to form a
18  disability, but the record is unclear when the plaintiff became
19  disabled. See id. at 590-91. However, there is no such ambiguity in
20  the instant case. Indeed, Plaintiff has no disability onset date. The
21  ALJ determined that Plaintiff was not disabled. (See AR 18). The
22  requirement to call a medical expert to clarify Plaintiff's disability
23  onset date was therefore not triggered. Sam, 550 F.3d at 809.
24  Accordingly, Plaintiff's claim fails.

25

26  \\
27  \\
28  \\

**VIII.**

**CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[8] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice. IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for the parties.

DATED: June 7, 2013.

                                          /S/
                                   _____
                                   SUZANNE H. SEGAL
                                   UNITED STATES MAGISTRATE JUDGE

**THIS MEMORANDUM IS NOT INTENDED FOR PUBLICATION NOR IS IT INTENDED TO BE INCLUDED IN OR SUBMITTED TO ANY ONLINE SERVICE SUCH AS WESTLAW OR LEXIS.**

---

[8] This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."